IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

BRUCE WARD,

                    Plaintiff,              Civil Action No.
                                            1:04-CV-1447
          v.                                (LEK/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

MASTAITIS LAW OFFICE                STEPHEN J. MASTAITIS, JR.,
1412 Route 9P                       ESQ.
Saratoga Springs, NY 12866

FOR DEFENDANT:

HON. GLENN SUDDABY                  WILLIAM H. PEASE, ESQ.
United States Attorney for the      Assistant U.S. Attorney
Northern District of New York
900 Federal Building
Syracuse, NY 13261-7198


OFFICE OF GENERAL COUNSEL           BARBARA L. SPIVAK, ESQ.
Social Security Administration      Chief Counsel, Region II
26 Federal Plaza
New York, NY 10278                  TOMASINA DIGRIGOLI, ESQ.
                                    Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Bruce Ward, who suffers from a seizure disorder, has commenced this action to judicially challenge an administrative determination by the Commissioner that he is not disabled and thus ineligible to receive disability insurance and Supplemental Security Income ("SSI") benefits under the Social Security Act ("Act").  In support of his challenge, Ward argues that the finding by the Administrative Law Judge ("ALJ") assigned to hear and determine the matter that he is not disabled is not supported by substantial evidence and disregards both contrary opinions from his treating physician and the subjective testimony of both the plaintiff and his girlfriend regarding the limitations experienced as a result of his condition, and further overlooks the nonexertional limitations resulting from his impairment.

Having carefully reviewed the record in light of plaintiff's assertions, I find that the Commissioner's determination of no disability resulted from the application of proper legal principles, and is supported by substantial evidence in the record.  I therefore recommend that judgment on the pleadings be entered dismissing plaintiff's complaint in its entirety.

2

I.      BACKGROUND

Plaintiff was born on August 8, 1955; at the time of the

administrative hearing in this matter, he was forty-eight years old.

Administrative Transcript at pp. 167-68.[1]  Plaintiff is not married, but has

one child from a previous marriage.  AT 172-73.  Plaintiff has lived with his

girlfriend for the past thirteen years.  AT 186.

Plaintiff attended school until ninth grade, but did not graduate or

obtain his general equivalency diploma ("GED").  AT 167-68.  Plaintiff last

worked on a full time basis in June 2001, but lost that employment when

the paper mill where he was working went out of business.  AT 169, 189-

90.  While employed at the paper mill plaintiff was assigned to several

different positions, including stock preparation and machine operation.  AT

189-90.

Plaintiff has suffered from a seizure disorder since birth.  AT 94,

114, 168-69.  Plaintiff claims that his seizures have affected his

performance at work, and that while working at the mill he was

reprimanded that his medication and his need for a set schedule was

_____

[1]      Portions of the administrative transcript (Dkt. No. 6) filed by the
Commissioner, together with her answer on, will be cited throughout this opinion as
"AT ___".

3

interfering with his job duties.  AT 188-89, 192, 194, 196.  Plaintiff also

claims that an earlier employer discharged him after three weeks when a

coworker reported that he had experienced a seizure.  AT 189.

Plaintiff's epileptic condition has been monitored since 1981 by Dr.

Thomas I. Soule, a physician practicing with Glens Falls Neurology, PC.

AT 137.  Over the years plaintiff's condition appears to have been well-

controlled by medication, which has prevented plaintiff from having

generalized seizures.  AT 87, 112-14, 120-21.

In the years immediately preceding June of 2001, Dr. Soule

recorded in his office notes an increase in the frequency of "auras"

experienced by the plaintiff, possibly exacerbated by long hours at work

and shift changes.[2]  AT 87, 112-14, 120-21.   Dr. Soule described

plaintiff's auras as motor disturbances without loss of consciousness, or

"daze" spells, and opined that Ward was not disabled or functionally

impaired by them.  AT 87, 112-14, 120-21.

On July 7, 2001, plaintiff underwent an electroencephalograph

("EEG") test at Dr. Soule's direction.  AT 110.  The results of that testing

---

[2]      According to one authoritative medical source, an aura is described as "a subjective sensation or motor phenomenon that precedes and marks the onset of an episode of a neurological condition, particularly an epileptic seizure or a migraine." Dorland's Illustrated Medical Dictionary 173 (29th ed. 2000).

4

were abnormal, revealing a focal, left central parietal spike wave.[3]  AT
110.

On July 12, 2001, Dr. Soule met with plaintiff as a follow-up to his
EEG and to complete a statement regarding Ward's eligibility to drive.  AT
109.  According to a letter documenting that visit, Dr. Soule noted that
plaintiff's partial spells did not interfere with his ability to drive, and
completed a statement to that effect, though noting that plaintiff had
voluntarily chosen not to drive.  *Id.*  As a result of that visit, Dr. Soule
substituted a combination of Depakote and Dilantin for plaintiff's prior
medication regime, consisting of phenobarbital and Dilantin, concluding
that plaintiff's EEG abnormality would likely be more responsive to
Depakote.  *Id.*

On September 13, 2001, Dr. Soule reported that based upon an
examination during an office visit of the previous day, plaintiff appeared to
be "doing well" on his new combination of medication, and did not look
"over-medicated."  AT 107.  Based upon those findings, Dr. Soule
increased plaintiff's dosage, noting that plaintiff had been at a low
therapeutic level.  *Id.*  Dr. Soule also noted that although plaintiff still

---

[3]     Plaintiff experienced an electrographic seizure while that EEG testing
was in progress.  AT 110.

experienced occasional auras, he had not suffered any major episodes that would prohibit him from driving an automobile. *Id.*

Since September of 2001, plaintiff has seen Dr. Soule between two and three times a year, generally for the purpose of obtaining his medication. AT 190-91. During one of those visits, on August 27, 2002, Dr. Soule reported that plaintiff was having auras but no seizures, and observed that the plaintiff looked and felt well and had no neurological findings or complaints. AT 106. Later, on January 13, 2003, Dr. Soule reported that plaintiff was not having any problems with seizures, and therefore ordered no studies or return appointments. AT 105.

On February 11, 2004, on referral from Dr. Soule, EEG testing was again administered to the plaintiff. AT 146. The results of that testing were regarded as both abnormal, and consistent with plaintiff's history of seizures, with no change from prior EEG results discerned. *Id.* On February 13, 2004, following that testing, Dr. Soule noted that plaintiff continued to suffer from "partial seizures" but had not experienced any generalized seizures. AT 147.

In response to a request from plaintiff's counsel, Dr. Soule wrote on February of 2004 that in his opinion the plaintiff is permanently disabled,

and had been over the prior three years.  AT 137.  In an accompanying physical capacities evaluation, dated February 18, 2004, Dr. Soule opined that plaintiff could sit, stand, and/or walk for six hours in an eight-hour day; was capable of lifting and carrying up to five pounds frequently and fifty pounds occasionally; and could use his hands and feet for repetitive actions.  AT 142-43.  In that report, however, Dr. Soule noted that when working plaintiff should avoid unprotected heights, being around moving machinery and driving automotive equipment, and additionally expressed his views that Ward was mildly restricted from exposure to marked changes in temperature and humidity.  AT 143.

A residual functional capacity assessment was performed a year earlier by Dr. Ziegler, an agency medical consultant.  AT 129-34.  In his report, dated February 13, 2003, Dr. Ziegler opined that plaintiff had no exertional, postural, manipulative, visual or communicative limitations as a result of his seizure disorder.  AT 130-31.  Dr. Ziegler did, however, also recommend that plaintiff avoid certain work-related hazards, such as machinery and heights.  AT 132.

Both Ward and his girlfriend, Wanda Landry, testified at the administrative hearing regarding plaintiff's condition.  Ms. Landry stated

that she has seen plaintiff experience between five and seven "spells" a

day, which make him hungry, fatigued, and irritable.  AT 192-93.  Ms.

Landry further testified that plaintiff cannot understand what is going on

around him during and immediately after an episode, although she offered

no more detailed observations regarding the spells, their severity, or their

duration.  AT 193.

During his hearing testimony, the plaintiff stated that his seizures

have been getting progressively worse and more frequent, although he

had not experienced a grand mal seizure since at least 1999.[4]  AT 182-83,

190.  Plaintiff described his seizures as causing him to "go blank" and

stare for about three or four minutes, and sometimes to spill his coffee.

AT 179-80, 183.  Plaintiff also claimed that he sometimes falls over,

although it is unclear whether he attributes this condition to his seizures.

AT 183-84.

Plaintiff asserts that he has experienced adverse side effects from

his medication.  At the hearing, plaintiff testified that he has problems

walking on occasion – because his knees "snap" – something his doctor

has apparently attributed to his medication.  AT 176.  Plaintiff also

---

[4]        Plaintiff's companion, Ms. Landry, testified that the plaintiff's last grand mal seizure was in 1980.  AT 194.

8

complains that his medications make him drowsy.  AT 185.

In both documents relating to his disability benefits application and hearing testimony, plaintiff described his daily activities in some detail. According to Ward, during the day he watches television, naps, or does puzzles.  AT 73, 175, 188.  Ms. Landry, who works across the street from their home, returns to cook him meals; when she is unavailable, plaintiff's neighbors assist him if he has a problem.  AT 174, 186-87.  Plaintiff shops for groceries and does laundry with his girlfriend, and sometimes vacuums or does other housework.  AT 73, 75, 174.  Ward is able to groom himself and shower on his own.  AT 175-76.  Plaintiff visits friends between two and three times a week, and attends birthday parties.  AT 77.

Although the plaintiff has a driver's license, he has not driven since 2002, a fact which he attributes to his symptoms.  AT 177-78.  Plaintiff claims to have had seizures while driving, requiring Ms. Landry to take control of the steering wheel.  AT 178, 195.  Despite plaintiff's apparent choice not to drive – a fact repeated by Dr. Soule in his letter of July 12, 2001, AT 109 – plaintiff's medical providers, including Dr. Soule, have consistently approved his motor vehicle applications, apparently suggesting that he is able to drive notwithstanding his condition, even

when it was reported by the plaintiff that his auras had increased.  *E.g.*,

AT 83, 90, 91, 94, 105, 106, 107, 109, 120-21.

II.    PROCEDURAL HISTORY

     A.    Proceedings Before The Agency

     Plaintiff filed applications for disability and SSI benefits under Titles

II and XVI, respectively, of the Act on January 16, 2003, alleging an onset

date of June 22, 2001.  AT 41-43, 153-54.  Those applications were

denied.  AT 24-28, 156-60.

     At plaintiff's request, a hearing was conducted on March 16, 2004 to

address the agency's denial of benefits.  AT 164-98.  That hearing yielded

a decision from ALJ Joseph F. Gibbons, dated April 15, 2004, finding that

plaintiff was not disabled and upholding the denial of benefits.  AT 11-21.

In his decision, ALJ Gibbons applied the now-familiar five step sequential

analysis, noting at step one that plaintiff has not engaged in substantial

gainful activity since his alleged disability onset date.  AT 15.  At step two,

the ALJ concluded that while plaintiff suffers from focal seizures which are

"severe" within the meaning of the governing standards, that impairment

did not meet or equal any of the presumptively disabling listed conditions

set forth in the applicable regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.

*See* AT 16.

The ALJ next proceeded to review the record in order to determine plaintiff's residual functional capacity ("RFC"), concluding that despite his condition Ward retains the ability to perform work at a medium exertional level.[5]  AT 18-20.  Specifically, ALJ Gibbons found that plaintiff could lift up to fifty pounds on an occasional basis and twenty-five pounds frequently; sit, stand and walk for up to six hours; and work in an environment which would not require working at unprotected heights and around moving machinery.  AT 18.  Applying this RFC, the ALJ concluded that plaintiff was precluded from his past relevant work, since his employment in the paper mills involved machinery.  AT 19.

Proceeding to step five, the ALJ next applied his RFC finding to the medical-vocational guidelines contained within the regulations, 20 C.F.R. Pt. 404, Subpt. P, App.2 (the "grid") as a framework, noting that while plaintiff met substantially all of the characteristics of medium work his

---

[5]     The governing regulations define medium work as follows:

>  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

20 C.F.R. § 404.1567(c).

condition imposed the additional environmental limitation that he not work at unprotected heights or around moving machinery.  AT 19-20.  Referring to an agency ruling which determines that such environmental restrictions would not have a significant effect on work at any exertional level, ALJ Gibbons concluded that plaintiff's capacity for work was not compromised by a nonexertional limitation.  *Id.* (citing SSR 85-15).  The ALJ therefore concluded that based on his findings and plaintiff's other relevant characteristics, a determination of "not disabled" was supported by Medical-Vocational Rule 203.26.  AT 20.

The ALJ's decision became a final determination of the agency when, on November 12, 2004, the Social Security Administration Appeals Council denied plaintiff's request for review.  AT 5-7.

B.    This Action

Plaintiff commenced this action on December 14, 2004.  Dkt. No. 1. Issue was thereafter joined on April 12, 2005 by the Commissioner's filing of an answer, accompanied by an administrative transcript of relevant proceedings before and records considered by the agency.  Dkt. Nos. 5,6. With the filing of plaintiff's brief on May 3, 2005, Dkt. No. 7, and that on behalf of the Commissioner on June 15, 2005, Dkt. No. 8, this matter is

ripe for determination and has been referred to me for the issuance of a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(d).  *See also* Fed. R. Civ. P.

72(b).

III.    DISCUSSION

A.    Scope Of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal*

*v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.

Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*,

817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to

whether the Commissioner applied the proper legal standards, her

decision should not be affirmed even though the ultimate conclusion

reached is arguably supported by substantial evidence.  *Martone*, 70 F.

Supp.2d at 148.  If, however, the correct legal standards have been

applied and the ALJ's findings are supported by substantial evidence,

those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)). To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record. *Id.*; *Martone*, 70 F. Supp.2d at 148 (citing *Richardson*). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed. 42 U.S.C. § 405(g); *see Martone*, 70 F. Supp.2d at 148. In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. *Martone,* 70 F. Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level. *See Lisa v. Sec'y of Dept. of Health & Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991). Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency. *Parker*, 626 F.2d at 235; *Simmons v. U.S. R.R. Retirement Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

B.    Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.] "  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).   If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a

severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled". *Martone*, 70 F. Supp.2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable

17

of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp.2d at 150.

        C.    <u>Evidence In This Case</u>

The ALJ's finding of no disability is predicated upon his belief that despite his condition, plaintiff is capable of performing in most environments involving a medium work exertional level.  Plaintiff argues that this finding overlooks both contrary opinions of his treating physician and Ward's subjective assessment regarding his condition, and additionally fails to factor into the analysis the nonexertional limitations imposed by his seizure disorder.

        1.    <u>Plaintiff's Subjective Testimony Regarding His Limitations</u>

Plaintiff argues that in finding no disability the ALJ improperly rejected plaintiff's subjective complaints regarding his limitations and his inability to perform the full range of work attributed to him by the ALJ.

Unquestionably, an ALJ must take into account subjective complaints of pain in making the five step disability analysis.  20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d).  When examining the issue of pain,

however, the ALJ is not required to blindly accept the subjective testimony of a claimant. *Marcus*, 615 F.2d at 27; *Martone*, 70 F. Supp.2d at 151 (citing *Marcus*). Rather, an ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning pain*. See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984). In deciding how to exercise that discretion the ALJ must consider a variety of factors which ordinarily would be relevant on the issue of credibility in any context, including the claimant's credibility, his or her motivation, and the medical evidence in the record. *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL 59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. & Smith, M.J.) (citing *Marcus*, 615 F.2d at 27-28)). In doing so, the ALJ must reach an independent judgment concerning the actual extent of pain suffered and its impact upon the claimant's ability to work. *Id.*

When such testimony is consistent with and supported by objective clinical evidence demonstrating that claimant has a medical impairment which one could reasonably anticipate would produce such pain, it is entitled to considerable weight.[6] *Barnett*, 13 F. Supp.2d at 316; *see also*

---

[6]     In the Act, Congress has specified that a claimant will not be viewed as disabled unless he or she supplies medical or other evidence establishing the existence of a medical impairment which would reasonably be expected to produce the pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(A).

20 C.F.R. §§ 404.1529(a), 416.929(a).  If the claimant's testimony

concerning the intensity, persistence or functional limitations associated

with his or her pain is not fully supported by clinical evidence, however,

then the ALJ must consider additional factors in order to assess that

testimony, including: 1) daily activities; 2) location, duration, frequency and

intensity of any symptoms; 3) precipitating and aggravating factors; 4)

type, dosage, effectiveness and side effects of any medications taken; 5)

other treatment received; and 6) other measures taken to relieve

symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

After considering plaintiff's subjective testimony, the objective

medical evidence, and any other factors deemed relevant, the ALJ may

accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp.2d

at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such

testimony is rejected, however, the ALJ must explicitly state the basis for

doing so with sufficient particularity to enable a reviewing court to

determine whether those reasons for disbelief were legitimate, and

whether the determination is supported by substantial evidence.  *Martone*,

70 F. Supp.2d at 151 (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608

(S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial

evidence, the decision to discount subjective testimony may not be disturbed on court review. *Aponte v. Secretary, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

Plaintiff's arguments in this case do not center upon claims of pain in the true sense. Rather, the focus of Ward's claim is upon his testimony to the effect that he suffers from daily incidents which he describes as momentary seizures. *See*, *e.g.*, AT 190. While it is not entirely clear how, plaintiff maintains, such events would impair his ability to perform in most medium work settings, his argument is appropriately analyzed under the familiar subjective pain complaint model. *See Campbell v. Barnhart*, 178 F.Supp.2d 123, 133-34 (D. Conn. 2001). The focal point of that analysis is not so much the presence of a condition which could cause the claimed symptoms, but instead on the resulting effects suffered by the claimant. *Id.*

During the hearing plaintiff testified to the effects he experiences as a result of his seizure disorder. According to plaintiff, his seizures have become gradually worse and more frequent. AT 182-83, 190. Plaintiff describes them as "go[ing] blank" and staring for about three or four minutes. AT 179-80, 183. Plaintiff also claims that he sometimes falls

over, although it is unclear whether he attributes this to his seizures.  AT 183-84.

Plaintiff also asserted at the hearing that he has side effects from his medication.  Specifically, plaintiff testified that he has problems walking sometimes because his knees "snap" from his medication.  AT 176. Moreover, plaintiff claimed his medications make him drowsy.  AT 185.

The ALJ's rejection of plaintiff's subjective allegations of limitations is well supported and adequately explained in his decision.  ALJ Gibbons noted that even though plaintiff testified that he had experienced a grand mal seizure three years prior to the hearing, Dr. Soule's records and reports lack any indication that plaintiff experienced a major seizure during that time period.[7]  AT 18.  The ALJ also noted that although plaintiff alleged during the hearing that he had difficulty walking due to knee problems, there was no medical evidence of any complaints or treatment with respect to plaintiff's knees.  AT 18.

Plaintiff's claims that his condition had worsened and he cannot work due to his seizures garners no support from the record.  The notes of

---

[7]     Plaintiff's girlfriend, Ms. Landry, testified that the plaintiff's last grand mal seizure was in 1980.  AT 194. Similarly, Dr. Soule's records and reports indicate that plaintiff had not had a major seizure since at least 1980. *E.g.*, AT 87, 90-92, 94, 106, 114, 120-21.

Dr. Soule, plaintiff's treating physician, fail to substantiate the deterioration claimed by Ward.  While plaintiff claims an inability to work due to his condition, the record reveals that he did in fact work until 2001, and left that position not as a result of his medical condition, but instead due to a plaint closure.  Moreover, while claiming not to have driven for two years, plaintiff has held and currently maintains a drivers' license, owing in large part to signed yearly statements from his treating physician attesting to his ability to drive.

Based on the foregoing, I find that the ALJ's rejection of the plaintiff's testimony is supported by substantial evidence.

        2.    Rejection of Opinions from Treating Sources

The second prong of plaintiff's challenge to the ALJ's finding of no disability centers upon his contention that ALJ Gibbons improperly discounted certain opinions of Dr. Soule as inconsistent with his own treatment records.

Ordinarily, the opinion of a treating physician is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence.[8]  *Veino*, 312 F.3d at 588;

*Barnett*, 13 F. Supp.2d at 316.  Such opinions are not controlling,

however, if contrary to other substantial evidence in the record.  *Veino*,

312 F.3d at 588.  Where conflicts arise in the form of contradictory

medical evidence, their resolution is properly entrusted to the

Commissioner.  *Id.*

In deciding what weight, if any, an ALJ should accord to medical

opinions, he or she may consider a variety of factors including "[t]he

duration of a patient-physician relationship, the reasoning accompanying

the opinion, the opinion's consistency with other evidence, and the

physician's specialization or lack thereof[.]"  *See Schisler v. Sullivan*, 3

---

[8]       The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions
> from your treating sources . . . If we find that a
> treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is
> well-supported by medically acceptable
> clinical and laboratory diagnostic techniques
> and is not inconsistent with the other
> substantial evidence in your case record, we
> will give it controlling weight.   When we do
> not give the treating source's opinion
> controlling weight, we apply [various factors]
> in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must provide reasons for the rejection. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Failure to apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions. *Johnson*, 817 F.2d at 985; *Barnett*, 13 F. Supp.2d at 316-17.

Unquestionably, as plaintiff points out, Dr. Soule has been treating plaintiff for a significant period of time, albeit not with marked frequency. In response to a request for an opinion from plaintiff's counsel, Dr. Soule opined that plaintiff had been totally disabled for three years. AT 137. To the extent that this statement purports to opine on the issue of disability or plaintiff's inability to work in any job, it was properly discounted by the ALJ as addressing an issue specifically reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Plaintiff argues that the ALJ improperly determined that the statements made by Dr. Soule in his medical notes were inconsistent with his functional capacities assessment, specifically with respect to plaintiff's

ability to operate an automobile and the maximum amount of hours that plaintiff is capable of working.  It should be noted that ALJ Gibbons did not discount Dr. Soule's opinions completely, and in fact found the bulk of Dr. Soule's opinion to be "well-supported".  Indeed, the ALJ's medium work finding is consistent with Dr. Soule's physical capacities evaluation dated February 18, 2004, in which Dr. Soule opined that plaintiff could sit, stand, and walk for six hours each in an eight-hour day and lift and carry up to fifty pounds occasionally.  AT 17, 142-43.  Moreover, the ALJ incorporated Dr. Soule's opinion that plaintiff avoid working at unprotected heights and being around moving machinery into his RFC finding.  *Id.*

Plaintiff argues that when rejecting Dr. Soule's restriction against driving, AT 143, ALJ Gibbons failed to consider the impact of plaintiff's abstention from driving.  As the ALJ points out in his opinion, however, plaintiff's medical providers, including primarily Dr. Soule, have always approved plaintiff's motor vehicle applications and asserted that plaintiff's condition did not interfere with his functional ability to drive, even when plaintiff reported that his auras had increased and that he chose to voluntarily abstain from driving.  *E.g.*, AT 83, 90, 91, 94, 105, 106, 107, 109, 112, 120-21.  Indeed, at one point Dr. Soule noted that he hoped that

plaintiff would receive notification from the Department of Motor Vehicles that he would no longer be required to submit a physician's statement, given the long period of time that had transpired since plaintiff experienced a generalized seizure.  AT 106.

Plaintiff also disputes the ALJ's rejection of Dr. Soule's restriction of plaintiff's work week to five days and four to six hours per day, arguing that Dr. Soule recommended further restriction of plaintiff's hours based on plaintiff's progressively worsening condition.  As ALJ Gibbons indicated, however, on March 30, 2001, less than three months before plaintiff's alleged onset date, Dr. Soule noted that plaintiff could be successfully gainfully employed if he was restricted to a consistent schedule of forty hours per week on day shift.  AT 112-13.  The record fails to disclose the type of significant worsening of plaintiff's condition that would explain this change of position.  Plaintiff testified at the hearing that he only sees Dr. Soule two to three times a year to obtain refills of his medication.  AT 190-91.  In a report dated February 13, 2004, five days before Dr. Soule rendered his functional capacities report, Dr. Soule noted that it had been more than a year since plaintiff's last visit.  AT 147.

In rejecting Dr. Soule's somewhat contradictory opinions, ALJ

27

Gibbons relied in part upon the opinions of a state agency consultant, rendered in February of 2003.  AT 17; *see* AT 129-34.  In his report that consultant discerned no significant limitations based upon plaintiff's condition, other than with respect to exposure to hazards such as machinery or heights, which should be avoided.  *Id.*  The opinions of a state agency consultant are entitled to weight, and though less persuasive than treating physician opinions, can provide substantial evidence to support an ALJ's determination and, if well supported, can form a proper basis for discounting a treating physician's opinions.  *Barringer v. Comm'r of Soc. Sec.*, 358 F.Supp.2d 67, 79 (N.D.N.Y. 2005) (Sharpe, J.).

Having carefully reviewed the record, I find that the ALJ's rejection of limited portions of plaintiff's treating physician's functional capacities evaluation was both properly explained and supported by substantial evidence.

### 3.    Nonexertional Impairments

Plaintiff asserts that when formulating his RFC and applying it to the grid, ALJ Gibbons failed to consider a variety of nonexertional impairments that he allegedly experiences, such as an inability to sit or stand for any extended period of time; an inability to tolerate postural

features of many jobs; "snapping" knees and problems walking as a result;

a tendency to fall; seizures; and drowsiness from his medications.

A claimant's RFC represents a finding of the range of tasks he or

she is capable of performing notwithstanding the impairments at issue.  20

C.F.R. § 404.1545(a).  An RFC determination is informed by consideration

of a claimant's physical abilities, mental abilities, symptomology, including

pain, and other limitations which could interfere with work activities on a

regular and continuing basis.  *Id.*; *Martone*, 70 F.Supp.2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore

assess plaintiff's exertional capabilities, addressing his or her ability to sit,

stand, walk, lift, carry, push and pull.  20 C.F.R. § 404.1569a.

Nonexertional limitations or impairments, including impairments which

result in postural and manipulative limitations, must also be considered.

20 C.F.R. § 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 §

200.00(e).  When making an RFC determination, an ALJ must specify

those functions which the claimant is capable of performing; conclusory

statements concerning his or her capabilities, however, will not suffice.

*Martone*, 70 F.Supp.2d at 150 (citing *Ferraris*, 728 F.2d at 587).  An

administrative RFC finding can withstand judicial scrutiny only if there is

substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F.Supp.2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F.Supp. 300, 309-10 (E.D.N.Y. 1997).

Contrary to plaintiff's assertion, the ALJ did expressly consider a majority of the limitations plaintiff now asserts.  Plaintiff's testimony about his inability to sit or stand for extended periods of time and tendency to fall was described in the ALJ's decision and belied by the reports of both Dr. Ziegler, a consulting physician, and Dr. Soule, plaintiff's own treating neurologist.  AT 18, 129-34, 137-43.  Similarly, Dr. Ziegler noted no postural limitations experienced by plaintiff in his functional capacity report, while Dr. Soule reported only occasional postural limitations.  AT 130-31, 143.  Those opinions were credited in large part by the ALJ when determining plaintiff's residual functional capacity.  *See* AT 17-18. Additionally, ALJ Gibbons explicitly noted and accorded little weight to plaintiff's assertion that he experiences knee problems, AT 176, based on the complete lack of any evidence in plaintiff's medical record that he ever sought treatment for such a condition.  AT 18.

The ALJ discussed plaintiff's seizures in detail.  He recounted

plaintiff's testimony about the frequency and intensity of his seizures and reviewed Dr. Soule's analysis of the possible factors that could contribute to the effects plaintiff experiences.  AT 19.  Moreover, the ALJ acknowledged the nonexertional aspect of those seizures when he noted that a person like plaintiff with a seizure disorder who is restricted only from working at unprotected heights and near moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels.  AT 19-20 (citing SSR 85-15).  Where, as is the case in this instance, a claimant experiences a combination of exertional and nonexertional limitations, and consideration of the exertional limitations alone does not result in a finding of disability, the grid can be used as a "framework", although it cannot direct a conclusion.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2). Accordingly, the ALJ's application of the grid as a "framework" in this instance was permissible.  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986.

In support of his argument that the ALJ's resort to the grid was improper, plaintiff urges a variety of nonexertional impairments ranging from drowsiness and knee snapping to the need to avoid heights or

operation of machinery.  An ALJ need not follow up on items raised by testimony which he or she does not consider credible, nor must an ALJ call a vocational expert in every case in which a potential nonexertional impairment appears.  *McGee v. Bowen*, 647 F.Supp. 1238, 1248 (N.D. Ill. 1986).  In order to require vocational testimony above and beyond use of the grid a nonexertional impairment must "significantly limit" or "significantly diminish" a plaintiff's work capacity.  *Bapp*, 802 F.2d at 605-06.

Plaintiff was equivocal in his disability reports to the Social Security Administration as to whether he experienced side effects from his medication.  *Compare* AT 61 (listing no side effects in connection with Dilantin and Depakote) *with* AT 69 (listing side effects as "tired" and "weak").[9]  In response to his attorney's questioning at the hearing, plaintiff asserted that the medication made him "drowsy" but did not elaborate.  AT 185.  On the other hand, Dr. Soule's notes since July 2001, when plaintiff was prescribed his current medication, include no concerns by plaintiff or

---

[9]    In his request for a hearing by an administrative law judge, plaintiff noted that he could not run machinery due to his medications.  AT 29.  Plaintiff's assertion in that regard is less a description of side effects than a functional conclusion on his part, which in any event was embodied in the ALJ's RFC finding which incorporated a restriction on the operation of machinery.  AT 18-20.

Dr. Soule about side effects or limitations caused by his medication.  *E.g.*, AT 105, 106, 107, 148.  In fact, in September of 2001 Dr. Soule noted that plaintiff was "doing well" on his medication and did not look "overmedicated."  AT 107.

"Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations."  *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002).  In this case, the record is devoid of any such limitations which could be attributed to plaintiff's medication.  For these reasons I recommend a finding that the ALJ's failure to specifically mention the plaintiff's side effects in his decision and develop the record as to those effects was not error.  *E.g.*, *French v. Massanari*, 152 F.Supp.2d 1329, 1338 (M.D. Fla. 2001) (no duty by ALJ to develop the record when the plaintiff did not allege that side effects contributed to his disability, alleged only that the medication made him "groggy", and the record was devoid of complaints by plaintiff or concerns by physicians about side effects); *see also*, *e.g.*, *Michaels v. Apfel*, 46 F.Supp.2d 126, 139-40 (D. Conn. 1999) (ALJ's failure to consider alleged nonexertional impairment of loss of balance not reversible error where plaintiff was equivocal in disability

reports about balance and no examining physicians described balance problems severe enough to significantly limit plaintiff's work capacity).

The only nonexertional limitation borne out by the record, and recognized by the ALJ, as affecting plaintiff's ability to work involves heights and use of machinery.  Taking into account the teachings of SSR 85-15, the ALJ properly concluded that with approximately 2,500 jobs in the national economy falling within the sedentary, light and medium work categories, *see* AT 20, surely the nonexertional limitations presented by plaintiff's condition would not reduce that number by such a factor as to warrant a finding that none exist that are capable of being performed by the plaintiff.[10]

In sum, properly utilizing the grid as a framework, ALJ Gibbons concluded that plaintiff is not disabled, and found it unnecessary to elicit expert vocational testimony before reaching that conclusion.  The ALJ's determination resulted from application of proper legal principles, and is supported by substantial evidence.

---

[10]    That ruling provides, in pertinent part, that "[a] person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels." SSR 85-15.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

In determining that the plaintiff retains the RFC to perform work at a

medium exertional level, in employment which would not require working

at unprotected heights and around moving machinery, the ALJ properly

considered the medical evidence in the record concerning plaintiff's

seizure disorder, including the reports of Dr. Soule, the plaintiff's treating

physician.  In making his determination of no disability ALJ Gibbons also

properly assessed plaintiff's subjective testimony regarding the limitations

he experiences as a result of his seizures.  The ALJ also did not

improperly overlook a series of nonexertional impairments asserted by

plaintiff; to the contrary, those impairments were discussed in his opinion,

but largely rejected as unsupported.  After determining plaintiff's RFC,

which reflected a combination of exertional and some modest

nonexertional limitations, the ALJ properly resorted to use of the grid as a

"framework", and the resulting finding of no disability is supported by

substantial evidence.

Based upon the foregoing, it is hereby

RECOMMENDED that defendant's motion for judgment on the

pleadings be GRANTED, the Commissioner's determination of no

disability be AFFIRMED, and that plaintiff's complaint in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within ten (10) days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roland v. Racette*, 984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties electronically.

Dated:     October 5, 2006
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

G:\socialsecurity\Ward.wpd

36